UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK BREINER DDS, LLC, and ) <br> EMSCULPT OF CT, L.L.C., ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> BTL INDUSTRIES, INC., ) <br>   ) <br> Defendant. ) | Civil Action No. <br> 24-12413-FDS |

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

**SAYLOR, J.**

Plaintiffs Mark Breiner DDS, LLC, and Emsculpt of CT, L.L.C., brought this action seeking equitable and monetary relief against defendant BTL Industries, Inc. Jurisdiction is based on federal-question and supplemental jurisdiction.

The amended complaint alleges that defendant engaged in unfair and deceptive business practices in the sale of certain "body-sculpting" equipment to plaintiffs.[1] The complaint also asserts claims against defendant for breach of contract; breach of the implied covenant of good faith and fair dealing; violation of state antitrust law; violation of the Robinson-Patman Act, 15 U.S.C. § 13; fraud; and unjust enrichment.

Defendant has moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) and 9(b). For the following reasons, the motion will be granted as to the claim asserted under the Robinson-Patman Act and otherwise denied without prejudice.

---

[1] For the sake of convenience, the amended complaint will hereinafter be referred to as "the complaint" unless the context indicates otherwise.

I.      **Background**

Unless otherwise noted, the following facts are set forth as alleged in the complaint.[2]

   A.      **Parties**

Mark Breiner DDS, LLC ("Breiner LLC") is a limited-liability company registered and based in Connecticut. (Am. Compl. ¶ 4). The company, which also goes by the name "Breiner Whole-Body Health Center," markets itself as a "holistic dental and medical practice." (*Id.*). Emsculpt of CT, L.L.C. ("ECT LLC") is a limited-liability company that is also registered and based in Connecticut. (*Id.* ¶ 5).[3]

BTL Industries, Inc., is a Massachusetts corporation with a principal place of business in Marlborough, Massachusetts. (*Id.* ¶¶ 6-7).[4] It develops and manufactures devices designed for body contouring and skin tightening. (*Id.* ¶ 7).

   B.      **Factual Background**

        1.      **Sales Meeting**

BTL sells equipment that purports to use electromagnetic energy and radiofrequency technology to help users tone their muscles and burn fat. (*Id.* ¶¶ 8-12). The company's leading products include the Emsculpt, Emsculpt Neo, Exilis, Emtone, and Emsella products. (*Id.* ¶¶ 8-12). BTL sells its equipment to retailers, who then advertise and sell sessions on the equipment to individual consumers. (*Id.* ¶¶ 13-14).

---

[2] On a motion to dismiss, the court may properly consider four types of documents outside the complaint without converting the motion into one for summary judgment: (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

[3] The complaint is silent as to the citizenship of plaintiffs' members, and plaintiffs have not filed affidavits or exhibits to otherwise establish the identities and citizenship of each of their members. The allegations in the complaint are therefore insufficient to establish diversity of citizenship under 28 U.S.C. § 1332.

[4] The complaint alleges that BTL is incorporated in Massachusetts. (Am. Compl. ¶ 6). However, in its motion to dismiss, BTL asserts that it is incorporated in Delaware. (Mot. to Dismiss at 2). The parties have not filed any official records verifying BTL's place of incorporation. At this stage, the Court proceeds with the facts as pleaded in the complaint.

On May 5, 2021, Mark Breiner, the principal owner of both Breiner LLC and ECT LLC, met with BTL representatives at his office in Connecticut. (*Id.* ¶ 15). At the meeting, BTL representatives presented a sales pitch about the company's various devices. (*Id.*). According to the complaint, the BTL representatives made several statements about Emsculpt products, including that Emsculpt "is selling so well and making customers good money"; Emsculpt Neo "is the holy grail and, like death and taxes, [it] is a certainty in life"; Emsculpt "purchases have an average payoff of four to five months"; Emsculpt is "the number one requested service in all of aesthetic and wellness right now"; "[i]t takes about 66 patients to pay [Emsculpt] device[s] off"; Emsculpt "is the number one device in the industry"; "[t]here is plenty of money to be made in providing services using BTL's equipment in the area of Connecticut [that] Breiner services"; other retail providers "are so successful that they are now also open on Saturdays"; Emsculpt "brings in 51[ percent] more new patients to [other] practices"; retail partners "could be missing out on $50,000 to $60,000" by waiting to sell BTL services; "BTL's equipment brings in money to providers all year round"; and "[p]roviders servicing customers with BTL equipment near Breiner are making good money." (*Id.*). The BTL representatives also allegedly told Breiner that one of its non-medical retailers in Connecticut was "making huge money" by selling Emsculpt Neo services. (*Id.* ¶ 28). A medical-practice retail partner in Maine was similarly "making huge money." (*Id.*). The complaint alleges that those statements were misrepresentations intended to induce Breiner to purchase BTL equipment. (*Id.* ¶ 15).

The complaint further alleges that at the sales meeting, the BTL representatives presented a spreadsheet projecting the income that Breiner would earn by selling Emsculpt Neo services. (*Id.* ¶ 28). According to the complaint, "[BTL] told Breiner that calculating the [minimum price] of $850 per treatment/session and the number of customers per day is how much money

3

[plaintiffs] will earn[.]" (*Id.*). The complaint alleges that "BTL knew that no such market exists and that virtually none of their retailers were able to sell the services for the [minimum price] of $850 per session or even $200 per session[.]" (*Id.* ¶ 29). The projections contained in BTL's spreadsheet allegedly significantly influenced Breiner to purchase the equipment. (*Id.* ¶ 28).

### 2. Sales Agreements

On May 5, 2021, immediately after the sales pitch, Breiner signed a contract on behalf of Breiner LLC to purchase two pieces of equipment—the Emsculpt Neo and the Exilis—from BTL. (*Id.* ¶ 16). On June 26, 2021, Breiner signed another contract on behalf of Breiner LLC to purchase the Emsella and Emtone. (*Id.*). In total, Breiner LLC paid $644,100.55 for the equipment. (*Id.*).[5] ECT LLC—which was formed two days after the sales meeting on May 7, 2021, and was not a party to the sales agreements—allegedly invested an additional $430,000 in "staffing, training, marketing, and business development" to operate the BTL equipment. (*Id.* ¶ 18; Mot. to Dismiss Ex. A).[6]

The Emsculpt Neo sales agreement contained a provision detailing a minimum-advertised-price ("MAP") program, according to which Breiner LLC could receive certain benefits from BTL if it agreed to advertise a consumer retail price of at least $850 per Emsculpt Neo session. (Am. Compl. ¶ 19; Am. Compl. Ex. A). For example, the contract specified that BTL would provide two years of free service coverage for the Emsculpt Neo device if Breiner LLC agreed to comply with the $850 MAP. (Am. Compl. ¶ 20). Compliance with the MAP also

---

[5] The complaint alleges that Breiner LLC financed the equipment purchase with a loan from a finance company called MMP. (Am. Compl. ¶ 17). The financing agreement allegedly did not disclose the interest rate of the loan, but allegedly caused the total cost of the purchase to increase to $901,344.62. (*Id.*).

[6] Exhibit A of BTL's initial memorandum in support of its motion to dismiss is a copy of the official ECT LLC registration record filed with the State of Connecticut. Because the document is an official public record, the Court may consider it without converting the motion to dismiss into a motion for summary judgment. *See Watterson*, 987 F.2d at 3.

4

provided access to BTL's clinic-referral site, eligibility to purchase future Emsculpt upgrades, and discounts on the consumable applicators used by the Emsculpt equipment. (*Id.*). With the discount, each applicator cost $15,000; without the discount, the applicators cost $30,000. (*Id.* ¶ 23). A decision not to participate in the MAP program or a violation of its terms would constitute a forfeiture by Breiner LLC of those benefits set forth in the contract. (*Id.* ¶ 20). A violation of the MAP-program terms occurred if, among other things, Breiner LLC offered Emsculpt Neo sessions for less than $850. (*Id.*).

The Emsculpt Neo sales agreement also contained provisions instituting a re-certification fee on equipment re-sales, priced at the "then current price list." (*Id.* ¶ 24; Am. Compl. Ex. A). The complaint alleges that the transfer fee amounted, in practice, to $100,000. (Am. Compl. ¶ 24). The sales agreement also contained a provision specifying that BTL reserved a security interest in the products that it sells. (*Id.* ¶ 25; Am. Compl. Ex. A). It also prohibited the delegation of duties or assignment of rights by Breiner LLC without BTL's prior written consent. (Am. Compl. Ex. A).

Each contract that Breiner signed also contained a choice-of-law provision specifying that the agreements "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." (*Id.*). The terms of use that Breiner signed in connection with the Emsculpt Neo purchase further stated that the "agreement and all matters arising hereunder or in connection herewith shall be governed by, interpreted under, construed[,] and enforced in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflicts of law principles thereof." (*Id.*). Each contract also included a forum-selection clause submitting all disputes arising out of the agreements to a court in Boston, Massachusetts. (*Id.*).

5

According to the complaint, BTL's contracts with other retail partners were substantially similar to the ones executed by Breiner. (Am. Compl. ¶ 22). However, BTL allegedly did not routinely enforce certain provisions of its contracts. (*Id.* ¶¶ 33, 35). For example, BTL allegedly did not enforce the transfer-fee or the security-interest provisions, resulting in the development of a secondary market for BTL's equipment. (*Id.* ¶¶ 33, 35). According to the complaint, BTL's equipment could be purchased for 75 to 90 percent discounts on the secondary market. (*Id.* ¶ 35).

### 3.     Withdrawal from the MAP Program

On May 30, 2023, Breiner sent a letter to BTL stating his intention to voluntarily withdraw Breiner LLC from the MAP-program portion of the Emsculpt Neo sales agreement. (Mot. to Dismiss Ex. B).[7] The letter further stated that Breiner would begin "offering the sale of Emsculpt Neo services at prices below the MAP pricing requirements[.]" (*Id.*). Plaintiffs allegedly opted out of the MAP program because they were unable to profitably sell the Emsculpt services at the $850 MAP price. (Am. Compl. ¶ 54).

In response to the notice provided by Breiner, BTL allegedly canceled Breiner LLC's discount on the applicator components, causing the unit price to revert to $30,000. (*Id.* ¶ 55). BTL also de-listed Breiner LLC from its online provider list and prevented Breiner from attending a conference of retail-partner owners. (*Id.*). In addition, BTL allegedly refused to distribute information about plaintiffs' assignee, Body Sculpting Discounters, on its websites.

---

[7] Exhibit B of BTL's initial memorandum in support of its motion to dismiss is a declaration by defense counsel Samantha Puckett with an attached copy of a letter dated May 30, 2023, and signed by Breiner. (*See* Mot. to Dismiss Ex. B). The letter communicates Breiner's intention to withdraw Breiner LLC from the MAP program. (*Id.*). BTL asserts that the complaint incorrectly alleges that Breiner LLC withdrew from the MAP program on November 30, 2023, as opposed to May 30, 2023. (Am. Compl. ¶ 54). Because (1) plaintiffs do not contest the veracity of the submitted letter and (2) the document is central to plaintiffs' asserted claims, the Court may consider the May 30, 2023 letter without converting the motion to dismiss into a motion for summary judgment. *See Watterson*, 987 F.2d at 3.

(*Id.* ¶¶ 55-56).  The complaint does not set forth any alleged facts explaining the circumstances of plaintiffs' assignment of rights to Body Sculpting Discounters.

Finally, in December 2023, BTL allegedly told one of its providers based in Oregon, Dr. Jill Brown, that plaintiffs were a "scam."  (*Id.* ¶ 57).  Plaintiffs had allegedly arranged for Dr. Brown to service one of their customers for four Emsculpt Neo sessions; however, Dr. Brown refused to work with plaintiffs after receiving BTL's message.  (*Id.*).  The prospective customer, Kelley Allen, also allegedly had been informed by BTL that plaintiffs were a "scam and stole her money."  (*Id.*).

### C.     Procedural Background

Plaintiffs filed suit in this court on September 20, 2024.[8]  Defendant then filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b).  Plaintiffs later filed an amended complaint, which asserts eight counts against defendant:  claims for violation of the Massachusetts Unfair Trade Practices Statute, Mass. Gen. Laws ch. 93A, § 11 (Count 1); violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b) (Count 2); violation of the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, § 1-14A, *et seq.* (Count 3); breach of contract (Count 4); breach of the implied covenant of good faith and fair dealing (Count 5); violation of the Robinson-Patman Act, 15 U.S.C. § 13 (Count 6); fraud (Count 7); and unjust enrichment (Count 8).

In granting the motion to amend, the Court permitted defendant to file supplemental briefing as to the new pleadings and causes of action set forth in the amended complaint.

---

[8] Plaintiffs initially filed suit in Connecticut state court on May 8, 2024.  *See Mark Breiner DDS, LLC et al. v. BTL Indus., Inc.*, FBT-CV24-6133927-S.  Defendant removed the action to federal court on June 7, 2024.  *See Mark Breiner DDS, LLC et al. v. BTL Indus., Inc.*, 24-cv-01002-KAD.  The parties entered a stipulation of dismissal on July 22, 2024, before bringing the suit to this court.

Defendant filed its supplement on May 5, 2025, and plaintiffs filed a response on May 19, 2025. With leave of court, defendant submitted a final reply brief on June 2, 2025.

## II.     Standard of Review

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Fed. R. Civ. P. 9(b), the standard for allegations of fraud is higher than the normal pleading standard. To survive a motion to dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

## III.    Analysis

### A.     Federal-Law Claim:  Robinson-Patman Act (Count 6)

Count 6 of the complaint asserts a claim under the Robinson-Patman Act, 15 U.S.C. § 13 ("RPA"). It is the only federal-law claim asserted in the complaint. Defendant has moved to

dismiss Count 6 on the ground that the complaint fails to state an RPA claim upon which relief can be granted.

The RPA prohibits price discrimination "between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly[.]" *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 219 (1993) (quoting 15 U.S.C § 13(a)). The statute "proscribes unequal treatment of different customers in *comparable* transactions." *FTC v. Borden Co.*, 383 U.S. 637, 643 (1966) (emphasis added).

The statute does not "bar a distributor from ever offering lower prices or discounts." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 866 (6th Cir. 2007). A seller may therefore "utilize promotional arrangements and provide financial incentives to favor its product or even to disfavor competing brands," thereby rewarding "purchasers who choose to align their own competitive objectives with those of their supplier." *Id.* The key inquiry is whether those incentives are available to all customers. Indeed, a "plaintiff in a Robinson-Patman Act suit cannot recover damages for lower prices paid by its competitors to the defendant if those same prices were available to the plaintiff from a practical standpoint and on equal terms with its competitors." *Id.*

Here, the complaint alleges that defendant engaged in price discrimination by increasing the costs of the consumable applicators that plaintiffs used for their Emsculpt devices. (Am. Compl. ¶¶ 93-94). Specifically, in accordance with the terms of the contract, defendant allegedly doubled the price of the applicator components from $15,000 to $30,000 in response to plaintiffs' withdrawal from the MAP program and their subsequent sale of Emsculpt services at below-MAP prices. (Am. Compl. ¶¶ 55, 94; Am. Compl. Ex. A).

The complaint does not allege that plaintiffs were prohibited from accessing the lower-cost consumable applicators.  Indeed, during their enrollment in the MAP program, plaintiffs did receive the promotional pricing, along with the other benefits listed in the parties' contract.  The complaint instead suggests that plaintiffs' withdrawal from the MAP program impermissibly subjected them to increased applicator costs.  However, the arrangement of the MAP program amounts to nothing more than an incentive program to encourage an "align[ment] [of] competitive objectives" between defendant and its retail partners.  *See Smith Wholesale*, 477 F.3d at 866.  In essence, defendant offered financial incentives to each of its retailers in the form of discounted consumable Emsculpt components, and in exchange required that the advertised prices of the Emsculpt sessions remain above a certain threshold.  Plaintiffs were not prohibited from participating in that discount program.  The fact that they made a business determination to withdraw from the program—and therefore forfeit the discounted consumable prices—does not render defendant's incentive program an illicit price-discrimination scheme under the RPA.

In opposition, plaintiffs contend that defendant's failure to enforce certain provisions of its contracts has also led to the emergence of a secondary market for Emsculpt equipment, through which other buyers can purchase defendant's devices at steep discounts.  (Pls.' Opp. at 7).  The complaint sets forth allegations that defendant's failure to enforce the transfer-fee and perpetual-security-interest provisions of its contracts has allowed for a "secondary equipment market to emerge."  (Am. Compl. ¶¶ 33, 35).  As a result, buyers can purchase defendant's equipment on the secondary market at a 75 to 90 percent discount compared to the price that Breiner LLC paid.  (*Id.* ¶ 35).  Plaintiffs assert that the price differential between the primary and secondary markets constitutes price discrimination in violation of the RPA.

However, the complaint fails to allege that any of the secondary-market purchasers are

defendant's customers. There is no allegation that defendant favored the unidentified secondary-market purchasers over plaintiffs; indeed, by definition, a secondary-market purchaser is not interfacing with defendant to acquire Emsculpt equipment. Again, the RPA is designed to protect "*those who compete* with a favored [customer.]" *Monahan's Marine, Inc. v. Bos. Whaler, Inc.*, 866 F.2d 525, 529 (1st Cir. 1989) (emphasis in original). The alleged secondary-market purchasers did not compete with plaintiffs for defendant's favor; they were not even customers of defendant, let alone favored customers. *See Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006) (stating that the "hallmark of the requisite competitive injury [under the RPA] . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser"). Thus, the mere fact that Emsculpt products are available at discounted prices on a secondary market does not create price-discrimination liability on defendant's part under the RPA.

Accordingly, Count 6, the lone federal claim asserted in the complaint, will be dismissed.

### B.     State-Law Claims

The remaining seven claims asserted in the complaint arise under state law. A federal court may only consider such claims if it properly exercises supplemental jurisdiction under 28 U.S.C. § 1367 or diversity jurisdiction under 28 U.S.C. § 1332.

"[I]t is settled law that district courts may decline to exercise supplemental jurisdiction over pendent state[-]law claims when the anchor federal claims for those state[-]law claims are dismissed." *Borras-Borrero v. Corporacion del Fondo del Seguro del Estado*, 958 F.3d 26, 36 (1st Cir. 2020). Indeed, when all federal-law claims are dismissed in the early stages of a lawsuit, "the federal court *should* decline the exercise of jurisdiction by dismissing the [remainder of the] case without prejudice." *Id.* (internal quotations and citations omitted) (emphasis added); *see also United States ex rel. Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5, 15

(1st Cir. 2016) (stating that supplemental state-law claims should also be dismissed when federal claims are dismissed "at such an early stage").  Thus, because the lone federal-law claim in this case will be dismissed under Fed. R. Civ. P. 12(b)(6), the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

As for diversity jurisdiction, it is not apparent whether complete diversity exists here. *See BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 695 (1st Cir. 2023) (stating that in order to exercise diversity jurisdiction, "diversity must be complete; that is, no plaintiff may be a citizen of the same state as any defendant").  Defendant, which is a corporation, is a citizen of Massachusetts based on the location of its principal place of business and its alleged place of incorporation.  *See id.* at 696.[9]  However, the citizenship of plaintiffs is not clear.  Both plaintiffs are limited-liability companies, which take the citizenship of *all* of their members.  *See id.*  The parties have submitted records indicating that Mark Breiner is the principal owner and a member of both LLCs; the records also indicate that he is a citizen of Connecticut.  However, that evidence does not establish whether he is the sole member of each entity, leaving open the possible existence of non-diverse plaintiff members—that is, citizens of Massachusetts (and, perhaps, Delaware).  Because plaintiffs' citizenship cannot be ascertained at this stage, the Court cannot properly exercise diversity jurisdiction over the matter.[10]

Nonetheless, because there is a reasonable likelihood that the parties are in fact diverse, plaintiff will be granted an opportunity to show cause that subject-matter jurisdiction exists under § 1332 and that therefore this court need not dismiss the remaining claims.  *See Carrozza*

---

[9] Defendant may also be a citizen of Delaware based on its assertion—which contradicts the complaint—that it is incorporated in Delaware, not in Massachusetts.  (Mot. to Dismiss at 2).

[10] Although defendant has not moved to dismiss the state-law claims for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), parties cannot confer such jurisdiction on a federal court by "acquiescence[] or consent."  *See BRT*, 68 F.4th at 696 (quoting *American Fiber & Finishing, Inc. v. Tyco Healthcare Grp., LP*, 362 F.3d 136, 139 (1st Cir. 2004)).

*v. CVS Pharm., Inc.*, 992 F.3d 44, 51 (1st Cir. 2021) ("The burden of establishing federal diversity jurisdiction rests on . . . the party invoking federal jurisdiction.").[11]  Plaintiffs shall make any such filing (including appropriate affidavits and other supporting materials) no later than 14 days after the date of this memorandum and order (that is, by July 24, 2025).

If plaintiffs are able to satisfy the Court that diversity jurisdiction exists, the Court will take up defendant's motion to dismiss as to the remaining counts, without need for further briefing.  If plaintiffs are not able to do so, the Court will decline to exercise subject-matter jurisdiction as to those counts, and they will be dismissed without prejudice.

## IV.    Conclusion

For the foregoing reasons, defendant's motion to dismiss is GRANTED as to Count 6 and otherwise DENIED without prejudice.  Plaintiff is directed to show cause no later than July 24, 2025, why the remaining counts should not be dismissed without prejudice for lack of subject-matter jurisdiction.  Should plaintiff make such showing, the motion to dismiss the state-law claims will be deemed renewed, without need for further briefing.  Otherwise, those claims will be dismissed without prejudice.

**So Ordered.**

                                  /s/ F. Dennis Saylor IV
                                  F. Dennis Saylor IV
Dated: July 10, 2025                United States District Judge

---

[11] There is no dispute that the amount in controversy is more than $75,000.  *See* 28 U.S.C. § 1332.