# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **MARK BREINER DDS, LLC, and EMSCULPT OF CT, L.L.C.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | **Civil Action No. 24-12413-FDS** |
| **BTL INDUSTRIES, INC.,** | ) ) ) | |
| **Defendant.** | ) ) ) | |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND DEFENDANT'S MOTION TO DISMISS

**SAYLOR, J.**

This is a case about the sale of purported medical equipment. Plaintiffs Mark Breiner DDS, LLC, and Emsculpt of CT, L.L.C., brought this action seeking equitable and monetary relief against defendant BTL Industries, Inc. Jurisdiction is based on diversity of citizenship.

The amended complaint alleges that BTL engaged in unfair and deceptive business practices in the sale to plaintiffs of certain "body-contouring" equipment that utilizes "high intensity focused electromagnetic energy." (Dkt. No. 33, Ex. B ¶¶ 13, 14). The complaint also asserts claims against BTL for breach of contract; breach of the implied covenant of good faith and fair dealing; violation of state antitrust law; fraud; and unjust enrichment.[1]

BTL has moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6) and 9(b). Plaintiffs have moved to amend the complaint for a second time, seeking to add five new

---

[1] The amended complaint also initially alleged a violation of the Robinson-Patman Act, 15 U.S.C. § 13, but the Court dismissed that claim in its July 10, 2025 memorandum and order. (*See* ECF No. 32).

defendants (MMP Capital, Inc.; Spark Marketing, Inc.; Amur Equipment Finance, Inc.; North Mill Credit Trust; and Dext Capital, LLC) and nine new claims, including claims for violation of New York General Business Law § 349, conspiracy, negligent misrepresentation, and violation of the Sherman Act, 15 U.S.C. § 1, against both the five new defendants and BTL.  It also seeks to add ten new alleged misrepresentations to the claim of fraud against BTL.

For the following reasons, both the motion to dismiss and the motion for leave to file a second amended complaint will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

The factual background is set out in the Court's July 10, 2025 memorandum and order granting defendant's motion to dismiss the claim under the Robinson-Patman Act.  (Dkt. No. 32).

### B.    Procedural Background

Plaintiffs filed suit in this court on September 20, 2024.[2]  Defendant then moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) and 9(b).  With leave of court, plaintiffs filed a first amended complaint, which asserted eight claims:  claims for violation of Mass. Gen. Laws ch. 93A, § 11 (Count 1); violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b) (Count 2); violation of the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93 (Count 3); breach of contract (Count 4); breach of the implied covenant of good faith and fair dealing (Count 5); violation of the Robinson-Patman Act, 15 U.S.C. § 13 (Count 6); fraud

---

[2] Plaintiffs initially filed suit in Connecticut state court on May 8, 2024.  *See Mark Breiner DDS, LLC et al. v. BTL Indus., Inc.*, FBT-CV24-6133927-S (Conn. Super. Ct. Feb. 11, 2025).  Defendant removed the action on June 7, 2024.  *See Mark Breiner DDS, LLC et al. v. BTL Indus., Inc.*, 24-cv-01002-KAD (D. Conn. July 27, 2024).  The parties stipulated to the dismissal of that action on July 22, 2024, after which the plaintiffs refiled the complaint in this court.

(Count 7); and unjust enrichment (Count 8).  Defendant's motion to dismiss was then deemed renewed as to the first amended complaint.

On July 10, 2025, the Court granted the motion to dismiss as to Count 6, which asserted the only federal-law claim in the case.  The amended complaint did not clearly allege the citizenship of the plaintiffs for purposes of establishing diversity jurisdiction.  Accordingly, after dismissing the only federal claim, the Court declined to exercise supplemental jurisdiction over the remaining state-law claims unless plaintiffs sufficiently demonstrated within 14 days that diversity jurisdiction existed.

On July 23, 2025, plaintiffs filed a declaration from Mark Breiner stating that he is the sole member of both plaintiff entities and that he is a citizen of Connecticut.  (*See* Dkt. No. 33-1).  The amended complaint alleged that defendant is a corporation incorporated in Massachusetts and with its primary place of business within the Commonwealth.  (Am. Compl. ¶ 6).  Because plaintiffs are citizens of different states from defendant, diversity jurisdiction has been established.  With the issue of jurisdiction resolved, the Court deemed defendant's motion to dismiss the remaining state-law claims to be renewed.

At the same time, plaintiffs moved for leave to file a second amended complaint.  The proposed amended complaint seeks to add five new defendants and nine new causes of action, and also asserts new factual allegations, including new allegations concerning allegedly fraudulent statements.  Defendant opposes the motion for leave to amend on grounds of undue delay, unfair prejudice, and futility.

## II.    Standard of Review

### A.    Motion to Dismiss

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual

allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Fed. R. Civ. P. 9(b), the standard for allegations of fraud is higher than the normal pleading standard. To survive a motion to dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The First Circuit has interpreted this language to require that a complaint must "specify the who, what, where, and when of the allegedly false or fraudulent representation" to meet the standard set by Rule 9(b). *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004).

When deciding a motion to dismiss, the court may properly consider four types of documents outside the complaint without converting the motion into one for summary judgment: (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

B.    **Motion to Amend**

In general, courts "should freely give leave [to amend a complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), unless there is "undue delay in filing the motion, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, [or] futility of amendment." *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 48 (1st Cir. 2009) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); Fed. R. Civ. P. 15(a)(2).

However, as a case progresses, "the burden on a plaintiff seeking to amend a complaint becomes more exacting." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). Indeed, when "a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." *Nikitine v. Wilmington Tr. Co.*, 715 F.3d 388, 390-91 (1st Cir. 2013) (quoting *Hayes v. New Eng. Millwork Distribs., Inc.*, 602 F.2d 15, 19-20 (1st Cir. 1979)). Although not a detail of "talismanic significance," "[w]hether the plaintiff, by rule or court order, had a prior opportunity to amend is one data point to be taken into account" in determining whether to permit an amendment. *Nikitine*, 715 F.3d at 390.

"[I]n assessing whether delay is undue, a court will take account of what the movant knew or should have known and what he did or should have done." *In re Lombardo*, 755 F.3d 1, 3-4 (1st Cir. 2014) (internal quotations omitted). Particularly disfavored is "a 'wait and see' approach to pleading, whereby plaintiffs 'having the needed information, deliberately wait in the wings with another amendment to a complaint should the court hold the first amended complaint was insufficient.'" *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 61 (1st Cir. 2018) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008)) (citation modified).

Finally, a local rule of this Court provides that "[a]mendments adding parties shall be sought as soon as an attorney reasonably can be expected to have become aware of the identity of the proposed new party."  D. Mass. L.R. 15.1(a).

## III.    Analysis

### A.    Motion to Dismiss

As noted, defendant moved to dismiss all claims under Fed. R. Civ. P. 12(b)(6) in the first amended complaint.  The Court granted the motion as to the one count asserting a federal-law claim (under the Robinson-Patman Act), and declined to exercise supplemental jurisdiction over the five remaining state-law claims pending a showing of the existence of diversity jurisdiction.  That showing has now been made, and the Court will therefore address the motion to dismiss the remaining claims.

#### 1.    Count 1:  Massachusetts Chapter 93A

Count 1 asserts a claim under Mass. Gen. Laws ch. 93A for unfair and deceptive trade practices.  Defendant has moved to dismiss Count 1 on the ground that the amended complaint fails to plead facts alleging that the relevant conduct occurred "primarily and substantially" in Massachusetts.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws, ch. 93A § 2.  Section 11 of Chapter 93A, "the business-to-business provision[] of the consumer protection statute," *Kunelius v. Town of Stow*, 588 F.3d 1, 17 (1st Cir. 2009), provides that no action may be brought under the statute unless the complained-of conduct occurred "primarily and substantially within the commonwealth."  Mass. Gen. Laws ch. 93A, § 11.

The critical inquiry to determine whether the statute's geographic predicate is met is "whether the center of gravity of the circumstances that give rise to the claim is primarily and

substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003). That requires a holistic, fact-based analysis, considering factors such as "where the defendant commits the unfair or deceptive act or practice," "where the plaintiff receives or acts on the wrongful conduct," and "where the plaintiff sustained losses caused by the wrongful conduct." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 118 (D. Mass. 2024) (quoting *Kuwaiti*, 438 Mass. at 472 n.13). The question of whether the test has been met is a question of law. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009). And despite the fact-intensive nature of the analysis, courts may nonetheless grant a motion to dismiss when the complaint fails to plead facts demonstrating that the center of the alleged misconduct occurred within Massachusetts. *See, e.g.*, *CrunchTime! Info. Sys., Inc. v. Frischs Restaurants, Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025). Typically, if the complaint alleges that "the plaintiff is located in Massachusetts and that the injury occurred in Massachusetts," it satisfies the geographic predicate at the motion-to-dismiss stage. *Jofran Sales, Inc. v. Watkins & Shepard Trucking, Inc.*, 216 F. Supp. 3d 206, 216 (D. Mass. 2016).

The amended complaint here fails to clear that threshold. It alleges neither that the plaintiffs are located in Massachusetts nor that the injury occurred in Massachusetts, and it cannot otherwise be plausibly read to allege that the complained-of conduct occurred "primarily and substantially" in Massachusetts. Plaintiffs are both limited liability companies that are based in and citizens of Connecticut. (Am. Compl. ¶¶ 4-5; Dkt. No. 33, Ex. A). The sales meeting at which defendant made the alleged misrepresentations occurred at Breiner's office in Connecticut. (Am. Compl. ¶ 15). Breiner signed the purchase agreements in Connecticut and his companies used the equipment in Connecticut. (Am. Compl. Ex. A). And plaintiffs

ultimately suffered their alleged economic injuries in Connecticut. (Am. Compl. ¶¶ 16-18). Those allegations show that "the center of gravity of the circumstances that give rise to the claim" was in Connecticut, not Massachusetts. *See Kuwaiti*, 438 Mass. at 473.

The fact that defendant is based in Massachusetts and created its contractual, financial, and marketing materials in Massachusetts is not sufficient to shift the "center of gravity" of the alleged violation at issue in this case. *See Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535, 545-46 (1st Cir. 2009) (holding that center of gravity of contract dispute was outside Massachusetts even where defendant was based in Massachusetts and "Massachusetts was in control of the negotiations and made all of the important decisions"). Although the amended complaint alleges that defendant conducted a single sales call with plaintiffs from Massachusetts, essentially all other relevant conduct concerning the alleged misrepresentations—the alleged fraudulent inducement, the execution of the sales contracts, and the damages suffered—occurred in Connecticut. (*Id.* ¶ 62).

Moreover, the choice-of-law provisions included in the parties' contracts are insufficient to satisfy the geographic predicate of § 11. The "Terms and Conditions of Sales" document that accompanied the sale of all the equipment plaintiffs purchased includes a choice-of-law clause providing that "[t]his Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." (Am. Compl., Ex. A at 2). The "Terms of Use" document, which only accompanied the sale of the Emsculpt Neo and Exilis, incudes a clause providing that "[t]his agreement and all matters arising hereunder or in connection herewith shall be governed by, interpreted under, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflicts of law principles thereof." (*Id.* at 3).

As an initial matter, the mere inclusion of a Massachusetts choice-of-law provision in a contract is insufficient to satisfy the geographic predicate for all claims arising out of that contract. *See Plastic Surgery Assocs., S.C. v. Cynosure, Inc.*, 407 F. Supp. 3d 59, 78-80 (D. Mass. 2019) (rejecting contention that, where party includes Massachusetts choice-of-law provision in contract, it "has waived . . . the statutory geographical requirement" of § 11). Therefore, more analysis is required to determine the effect, if any, of the choice-of-law provisions on where the "center of gravity" of the Chapter 93A claim is located.

For choice-of-law purposes, courts divide Chapter 93A claims into "contract-based" claims and "tort-based" claims, based on the factual allegations underlying them. *See Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 11 (1st Cir. 1994) ("[W]hen a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes."). Here, plaintiff's Chapter 93A claim is based on allegations of fraudulent misrepresentation, and therefore is considered tort-based for these purposes. And while some courts have suggested that the existence of a choice-of-law provision can be one factor among many in determining whether a *contract-based* Chapter 93A claim arose "primarily and substantially within the commonwealth," that reasoning has apparently not been extended to tort-based Chapter 93A claims. *See Citicorp N. Am., Inc. v. Ogden Martin Sys. of Haverhill, Inc.*, 8 F. Supp. 2d 72, 81 (D. Mass. 1998) (considering "whether the underlying contract is to be governed by and interpreted in accordance with Massachusetts law" as one factor in determining whether "contract-based Chapter 93A claim" arose "primarily and substantially" in Massachusetts). Therefore, the choice-of-law provisions in the parties' contracts do not bring the center of gravity of this tort-based Chapter 93A claim within the Commonwealth.

Accordingly, the amended complaint fails to allege that the events giving rise to the Chapter 93A claim occurred primarily and substantially in Massachusetts, as required to state a claim under § 11.  Count 1 will therefore be dismissed.

### 2.    Count 2:  Connecticut Unfair Trade Practices Act

Count 2 asserts a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b) ("CUTPA").  Defendant has moved to dismiss Count 2 on three grounds:  that the claim is time-barred; that the claim is barred by the choice-of-law provisions contained in the parties' agreements; and that the claim is barred by judicial estoppel.

Defendant is correct that the CUTPA claim is time-barred.  The relevant statute of limitations provides that no "action . . . may . . . be brought more than three years after the occurrence of a violation of [CUTPA]."  Conn. Gen. Stat. § 42-110g(f).  In interpreting § 42-110g(f), the Connecticut Supreme Court has noted that "[u]nlike the statutes of limitation of some other states applicable to unfair trade practices legislation analogous to our CUTPA, which expressly allow a certain period following the discovery of the deceptive practice for commencing suit . . . § 42-110g(f) provides only that an action must be brought within three years 'after the occurrence of a violation of this chapter.'"  *Fichera v. Mine Hill Corp.*, 541 A.2d 472, 475-76 (Conn. 1988).  That court further stated that "[i]n construing our general tort statute of limitations, . . . which allows an action to be brought within three years 'from the date of the act or omission complained of,' we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred."  *Id.* at 476.  Because the court was "unable to perceive any significant distinction . . . between the 'act or omission' reference . . . and the 'occurrence of a violation' phrase," it held that the CUTPA limitations period similarly could not be tolled until a cause of action has accrued.  *See id.*  Several

Connecticut trial court opinions have since reiterated that CUTPA's limitations period "begins to run from the date of the violation rather than the date of discovery of the violation." *Stankiewicz v. Snow*, 2013 WL 5614749, at *14 (Conn. Super. Ct. Sep. 20, 2013); *see also Fusaro v. Malik*, 2012 WL 898794, at *2 (Conn. Super. Ct. Feb. 27, 2012) (noting that CUTPA's statute of limitations "is an occurrence statute[,] not a discovery statute").

The CUTPA claim is therefore time-barred because it was "brought more than three years after the occurrence of a violation" of the statute and Connecticut law does not permit the limitation period to be tolled until a plaintiff's claim accrues.  The CUTPA violation necessarily occurred no later than May 5, 2021, when Breiner met with BTL's representatives and was induced to purchase defendant's equipment.[3]  Plaintiffs' initial state-court complaint, however, was not filed until May 8, 2024, three years and three days after Breiner signed the purchase agreement for the Emsculpt Neo on May 5, 2021.  (Def.'s Suppl. Memo. L. 5, Dkt. No. 27).  For that reason, plaintiffs' CUTPA claim is time-barred under Connecticut law and will be dismissed on that basis.

### 3.    Count 3:  Massachusetts Antitrust Act

Count 3 asserts a claim under the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93. Defendant has moved to dismiss Count 3 on the ground that the alleged anticompetitive conduct did not occur "primarily and predominantly" in Massachusetts.

Under section 4 of Chapter 93, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be

---

[3] The amended complaint is vague as to what exact conduct constituted the CUTPA violation; it merely alleges that "[d]efendant's actions described above"—that is, all the factual allegations in the complaint—"constitute unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of and in violation of Conn. Gen. Stat. § 42-110b."  (Am. Compl. ¶ 68).  However, plaintiffs do not argue that the CUTPA violation occurred on some date later than May 5, 2021.

unlawful." Mass. Gen. Laws ch. 93, § 4. However, "according to the statute's plain text and in accordance with federal constitutional principles, Chapter 93's reach is limited to regulating commerce within the boundaries of the Commonwealth." *Ronnie's Cycle Sales of Pittsfield, Inc. v. Harley-Davidson Motor Co., Inc.*, 2024 WL 5700197, at *7 (D. Mass. Dec. 17, 2024). Thus, a Chapter 93 claim may not be asserted unless the alleged "course of conduct, pattern of activity, or activities . . . occur[ed] and ha[d] their competitive impact primarily and predominantly within the commonwealth." Mass. Gen. Laws ch. 93, § 3.

Here, the amended complaint alleges that under the signed agreements, plaintiffs were prohibited from advertising Emsculpt Neo sessions below the "minimum advertised price" ("MAP") of $850 per session if they wanted to receive the MAP-program benefits, which the complaint alleges constituted an unreasonable restraint on trade in violation of Chapter 93. (Am. Compl. ¶¶ 74, 76-77). It further alleges that defendant, as the sole distributor of its patented technology, acted as a monopoly by exercising complete control on the prices at which plaintiffs could sell Emsculpt Neo services. (*Id.* ¶ 79).

However, as with the Chapter 93A claim, the amended complaint does not allege facts sufficient to show that defendant's alleged anticompetitive conduct occurred "primarily and predominantly" in Massachusetts. Again, defendant's enforcement of the MAP terms—which constituted the allegedly anticompetitive conduct at issue—occurred in Connecticut, where plaintiffs are registered and based and where they attempted to sell the Emsculpt services. Indeed, the amended complaint repeatedly alleges that no viable market existed *in Connecticut* to sell the Emsculpt services at the MAP pricing levels. (*See* Am. Compl. ¶¶ 15, 28, 37).

Moreover, when plaintiffs attempted to sell the Emsculpt products at below-MAP prices, defendant allegedly de-listed plaintiffs from its various online platforms and increased plaintiffs'

service costs in accordance with the parties' contract.  In addition, defendant allegedly informed one of its providers located in Oregon, Dr. Jill Brown, that plaintiffs were a "scam."  (Am. Compl. ¶ 57).  Thus, the alleged effects of defendant's conduct occurred in other states, such as Connecticut and Oregon.  And under Chapter 93, the alleged anticompetitive conduct must both have "occur[ed]" and "ha[d] i[its] competitive effect" within the Commonwealth.  Mass. Gen. Laws ch. 93, § 3.  Thus, even if the anticompetitive conduct occurred within the Commonwealth, that alone is insufficient to meet the geographic requirement.  Accordingly, Count 3 will be dismissed.

### 4.    Breach of Contract

Defendant next moves to dismiss Count 4, which alleges breach of contract.[4]  Under Massachusetts law, a claim for breach of contract requires the plaintiffs to show "(1) that the parties had an agreement supported by valid consideration; (2) that plaintiffs were ready, willing[,] and able to perform; (3) that defendant's breach has prevented them from performing; and (4) that plaintiffs were damaged."  *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996).

The amended complaint alleges that defendant breached the terms of the May 5, 2021 contract for the sale of the Emsculpt Neo and the Exilis.  Specifically, it alleges that the contract "specifie[d] that the equipment [was] purchased to provide particular treatment sessions in a market that would bring $850 per session[.]"  (Am. Compl. ¶ 86).  Because no viable customer

---

[4] Defendant contends that plaintiffs have waived the claim for breach of contract asserted in Count 4 because they failed to oppose the motion to dismiss as to that claim.  However, when deciding a motion to dismiss under Rule 12(b)(6), "the mere fact that a motion to dismiss is unopposed does not relieve the district court of the obligation to examine the complaint itself to see whether it is formally sufficient to state a claim."  *Pomerleau v. W. Springfield Pub. Sch.*, 362 F.3d 143, 145 (1st Cir. 2004) (quoting *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003)).  Thus, the Court may not treat plaintiffs' failure to oppose the motion to dismiss as to Count 4 as a procedural default.  *See id.*

base allegedly existed at that price point, the complaint alleges that defendant breached the contract. (*Id.*).[5]

However, nowhere in the contract is there a representation that a viable market existed, or must exist, at the MAP price point. Nor do the terms of the agreement make any promises or guarantees as to the market size, customer base, or profit margin for Emsculpt services in Connecticut. Although the contract details the MAP program terms and the consequences to Breiner LLC if it declined to sell Emsculpt services at the MAP, it does not set forth any obligations on defendant to ensure the market viability of the services at those prices.[6] The alleged lack of a viable market at the MAP price point does not therefore constitute a breach of contract because there was no contractual agreement as to the viability of the Emsculpt market. Accordingly, Count 4 will be dismissed.

### 5.    <u>Count 5:  Breach of Implied Covenant of Good Faith and Fair Dealing</u>

Count 5 asserts that defendant breached the implied covenant of good faith and fair dealing in its performance under the contract between the parties. Defendant has moved to dismiss Count 5 on the ground that the complaint fails to allege that defendant acted in bad faith in the performance of the contract.[7]

---

[5] Of the two plaintiffs, only Breiner LLC is a party to the contract at issue. (Am. Compl. Ex. A). Thus, to the extent that plaintiff Emsculpt of CT, L.L.C., asserts claims for breach of contract and breach of the duty of good faith and fair dealing, those claims will be dismissed on that basis in addition to the other grounds set forth in this order.

[6] The complaint alleges that defendant made multiple misrepresentations at the May 5, 2021 sales meeting with Breiner about the "profitability and existence of a market to sell" the Emsculpt services at the MAP price point. (Am. Compl. ¶ 15). Specifically, defendant's representatives allegedly stated that "[t]here is plenty of money to be made in providing services using [defendant's] equipment in the area of Connecticut [that] Breiner services." (*Id.*). However, none of the alleged statements purported to make a promise that Breiner LLC would reach a specific level of profitability from selling Emsculpt services. And, in any event, the executed contract itself contains no provision that conceivably created a duty on defendant's part to guarantee a minimum profit or customer base to Breiner LLC. *See Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779 (2002) (stating that when a contract is unambiguous, the circumstances of a contract's formation do not alter its meaning).

[7] Plaintiffs also do not oppose the motion to dismiss Count 5. Again, the Court must evaluate the issue on

The covenant of good faith and fair dealing, which is implied in every contract, "provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 82 (2014) (internal quotations omitted). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *UNO Restaurants, Inc. v. Boston Kenmore Realty Grp.*, 441 Mass. 376, 385 (2004).

"Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims[.]" *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 229 (D. Mass. 2005). For one thing, a complaint need not allege a breach of an express term of the contract. *See Speakman v. Allmerica Financial Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005). Rather, it must allege that defendant acted in "bad faith or [with] an absence of good faith," *see Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013), to "unfairly leverag[e] the contract terms for undue economic advantage," *Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 389 (D. Mass. 2012). The requirement of good-faith performance is, however, circumscribed by the obligations set forth in the contract, and "the covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship." *Speakman*, 367 F. Supp 2d at 132. And the duty of good faith and fair dealing applies only to the "performance . . . and enforcement" of a contract; it "does not deal with good faith in the formation of a contract," which is governed by different legal doctrines. Restatement (Second) of Contracts § 205, cmt. c (A.L.I. 1981); *see Cadle Co. v. Vargas*, 55 Mass. App. Ct. 361, 366 (2002) (citing § 205 as correctly stating Massachusetts law).

---

the merits, and may not treat plaintiffs' failure to oppose as a procedural default. *See Pomerleau*, 362 F.3d at 145.

Here, the amended complaint alleges that defendant breached the implied covenant by entering into a contract that required plaintiffs to adhere to the MAP pricing levels, even though it knew that no such market existed.  (Am. Compl. ¶ 90).  But those allegations do not concern defendant's *performance* of the contract; instead, they concern defendant's representations before the execution of the contract.  Moreover, nearly every complained-of "punitive" action taken by defendant in its performance under the contract—such as increasing the cost of the consumable components and de-listing plaintiffs from online forums—complied with the explicit and agreed-upon terms of the contract signed by Breiner.  The benefits of participating—and, conversely, the drawbacks of declining to participate—in the MAP program were clearly stated in the contract and reasonably shaped the expectations of the parties at the outset of their agreement.  Defendant's enforcement of the MAP contract provision cannot constitute a breach of the implied covenant of good faith and fair dealing because the implied covenant cannot create new rights or duties between the parties.  *See Speakman*, 367 F. Supp. 2d at 132.  Count 5 will therefore be dismissed.

### 6.    Count 6:  Fraud

Count 6 asserts a claim for fraud under Massachusetts law.  The amended complaint essentially alleges that at the May 5, 2021 sales meeting, defendant made various misrepresentations to Breiner, thereby fraudulently inducing plaintiffs to purchase defendant's equipment.  (Am. Compl. ¶ 15, 28-29).  Defendant has moved to dismiss Count 6 on the grounds that the claim is time-barred; that the complaint fails to plead a claim for fraud with sufficient particularity; and that the alleged misrepresentations are not actionable.

To prove a claim for fraud in the inducement under Massachusetts law, a plaintiff must demonstrate that "(1) the defendant made knowingly false statements; (2) those statements were made with the intent to deceive; (3) those statements were material to the plaintiff's decision to

execute the agreement; (4) the plaintiff reasonably relied on those statements; and (5) the

plaintiff was injured as a result of her reliance." *Delphi Corp. v. Litex, Inc.*, 394 F. Supp. 2d 331,

339 (D. Mass. 2005) (citing *Zyla v. Wadsworth*, 360 F.3d 243, 254 (1st Cir. 2004)).

At the pleading stage, a claim for fraud must meet the heightened standard of Fed. R. Civ.

P. 9(b), which "applies to state[-]law fraud claims asserted in federal court." *North Am. Catholic

Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). To satisfy the

requirements of Rule 9(b), the complaint must "specify the who, what, where, and when of the

allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,

374 F.3d 23, 29 (1st Cir. 2004). Moreover, the complaint must "set[] forth specific facts that

make it reasonable to believe that defendant knew that a statement was materially false or

misleading." *Cardinale*, 567 F.3d at 13. Indeed, "courts have uniformly held inadequate a

complaint's general averment of the defendant's knowledge of material falsity." *Id.*

### a.    Statute of Limitations

The Massachusetts statute of limitations for fraud claims is three years. Mass. Gen. Laws

ch. 260, § 2A. The limitations period for fraud claims under Massachusetts law is "three years

from the date the action accrues." *First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*, 839 F.

Supp. 2d 407, 413 (D. Mass. 2012). A cause of action for fraud "generally accrues when the

plaintiff discovers or reasonably should have discovered the defendant's fraud." *Id.* (citing

*Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002)).

Reading the complaint as a whole, it is a plausible inference that the allegedly fraudulent

conduct was not reasonably discoverable within the first three days after May 5, 2021. The fraud

claim is therefore not time-barred, at least based on the allegations of the complaint, and will not

be dismissed on that basis.

###### b.    <u>Identity of Speaker</u>

The complaint alleges that the fraudulent misrepresentations at issue were made by

"BTL" at a meeting on May 5, 2021, at "Breiner's office in Connecticut."  (Am. Compl. ¶ 15).

Of course, a corporation is not capable of speech and "can act only through agents."  *Instituto de*

*Educacion Universal Corp. v. U.S. Dep't of Educ.*, 209 F.3d 18, 22 (1st Cir. 2000).  One or more

of defendant's employees must have made those statements, but the amended complaint does not

identify precisely who those people were.  In cases involving fraud claims against corporate

defendants, the First Circuit has often applied the requirements of Rule 9(b) to require that the

plaintiff identify the natural persons who made allegedly false statements.  *See, e.g.*, *Rodi v.*

*Southern New England Sch. of L.*, 389 F.3d 5, 15 (1st Cir. 2004) (reversing dismissal of

fraudulent misrepresentation claims against law school that identified relevant speaker, but

affirming dismissal of those that did not); *Alternative Sys. Concepts, Inc.*, 374 F.3d at 30

(suggesting that fraudulent misrepresentation claim against corporation would require showing,

among other details, "who allegedly uttered the misleading statements" to pass muster under

Rule 9(b)).  Typically, the First Circuit has found identification of the corporate defendant itself

as the speaker sufficient only in cases involving writings, such as labels on consumer products,

which obviously have no human speaker.  *See, e.g.*, *Kaufman v. CVS Caremark Corp.*, 836 F.3d

88, 90 (1st Cir. 2016) (label on dietary supplement regarding benefits to "heart health"); *Dumont*

*v. Reily Foods Co.*, 934 F.3d 35, 39 (1st Cir. 2019) (label on coffee grounds styled "Hazelnut

Créme").

Nonetheless, this is one of the relatively rare circumstances in which the specificity

requirement of Rule 9(b) is satisfied despite the fact that no individual speaker is named in the

amended complaint.  The amended complaint alleges that the statements were made on a single

specific date (May 5, 2021) at a single specific location (Breiner's office in Connecticut) by one

or two representatives of BTL, under circumstances in which they were clearly speaking as agents of the corporation.  Presumably, it would pose little challenge for BTL to identify who participated in that sales call, and therefore the prospect of unfair prejudice is relatively slight.  Moreover, the purpose of the specificity requirement—which, in substance, is to prevent fraud claims based on only vague or generalized complaints—is not compromised by the failure to allege the names of the speakers under the narrow circumstances presented here.  Accordingly, the fraud claim will not be dismissed on that basis.

### c. Sufficiency of Alleged Representations

Defendant further contends that the amended complaint does not contain allegations of factual representations sufficient to support a claim for fraud.  A claim for misrepresentation generally requires proof that a factual representation (as opposed to an opinion or promise) was false.  "It is axiomatic that a defendant will not be liable for an affirmative false statement if the statement is, in actuality, not false."  *In re Access Cardiosystems, Inc.*, 404 B.R. 593, 641 (Bankr. D. Mass. 2009), *aff'd*, 488 B.R. 1 (D. Mass. 2012).

It is also well-established that puffery—that is, "exaggerated, vague, or loosely optimistic statements about a company"—is not actionable.  *See Delphi*, 394 F. Supp. 2d at 341 (quoting *In re Allaire Corp. Secs. Litig.*, 224 F.Supp.2d 319, 327 (D. Mass. 2002)); *see also Suero v. NFL*, 2022 WL 17985657, at *12 (S.D.N.Y. Dec. 16, 2022) (stating that the defendant's assertion that MetLife Stadium is "the number one stadium in the world" is "classic 'puffery'" because it constitutes a "general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion").

Furthermore, as a general matter, a seller may make "overly optimistic . . . projections," and the failure to "be as profitable as the [initial projections] indicated was possible" does not

render those projections fraudulent. *See In re Access Cardiosystems, Inc.*, 404 B.R. at 651, 674 (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 635 (1st Cir. 1996)).

The amended complaint identifies 13 allegedly false statements. (Am. Compl. ¶ 15). At least six of those statements clearly constitute opinion, puffery, or non-actionable projections:

- "Emsculpt NEO is the holy grail and, like death and taxes, Emsculpt NEO is a certainty in life." (Am. Compl. ¶ 15(b)).

- "Emsculpt and/or Emsculpt NEO is the number one requested service in all aesthetic and wellness right now. It is the number one purchase piece of equipment right now in all of aesthetics. It is a very hot brand because patients are asking for it. So, from that direct-to-consume level, people are hearing and rendering and seeing about Emsculpt NEO." (*Id.* ¶ 15(d)).

- "It is the number one device in the industry." (*Id.* ¶ 15(f)).

- "There is plenty of money to be made in providing services using BTL's equipment in the area of Connecticut Breiner services." (*Id.* ¶ 15(g)).

- "Emsculpt and/or Emsculpt NEO is the number one device in the industry." ((*Id.* ¶ 15(i)).

- "If providers wait to purchase the equipment and provides services using BTL's equipment, those providers could be missing out on $50,000 to $60,000 in sales." (*Id.* ¶ 15(k)).

At least one alleged statement appears to have been a statement of fact. (*See id.* ¶ 15(c) ("Emsculpt and/or Emsculpt NEO purchases have an average payoff of four to five months")). And the remaining six statements, although largely framed in terms of opinion, puffery, or projection, also contain factual assertions that conceivably could be proved wrong. Thus, for

example, the statement that "providers servicing BTL equipment that are usually open Monday through Friday are so successful that they are now also open on Saturdays," *see id.* ¶ 15(h), could be proved false if no such providers were or ever had been open on a Saturday. At least for purposes of resolving the motion to dismiss, the Court will treat those remaining statements as containing at least one assertion of fact that could form the basis for a fraud claim.

Under the circumstances, the Court will grant the motion to dismiss Count 6 to the extent it is based on the statements alleged in subparagraphs 15(b), (d), (f), (g), (i), and (k), and deny it as to the statements alleged in subparagraphs 15(a), (c), (e), (h), (j), (l), and (m).

### 7.  Count 8:  Unjust Enrichment

Count 8 asserts a claim for unjust enrichment under Massachusetts law. Defendant contends that the unjust-enrichment claim should be dismissed because the parties' relationship is governed by a written contract.[8]

Under Massachusetts law, "a plaintiff is not entitled to recovery on an unjust-enrichment or quantum-meruit theory where there is a valid contract that covers the same subject matter and defines the obligations of the parties." *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 541 (1st Cir. 2022). Here, the amended complaint alleges that defendant has been unfairly enriched by selling Emsculpt equipment to plaintiffs when no viable market for the equipment services existed. (Am. Compl. ¶¶ 100-102). However, the amended complaint also alleges that the parties signed a contract for the purchase of the Emsculpt equipment that sets forth the terms of the sale and the pricing of the services. Indeed, the written agreement is attached as an exhibit.

---

[8] As with Counts 4 and 5, plaintiffs do not oppose the motion to dismiss Count 8. Again, the Court must evaluate the issue on the merits and may not treat plaintiffs' failure to oppose as a procedural default. *See Pomerleau*, 362 F.3d at 145.

(*See* Am. Compl. Ex. A).  Because the contract is valid and covers the same subject matter as the unjust-enrichment claim, plaintiffs cannot assert this claim.  Count 8 will therefore be dismissed.

### 8.  Conclusion

For the foregoing reasons, the motion to dismiss will be granted as to Counts 1, 2, 3, 4, 5, and 8 of the amended complaint, and granted in part and denied in part as to Count 6.

### B.  Motion to Amend

As noted, plaintiffs also seek to amend the complaint for a second time to add five new defendants:  MMP Capital, Inc.; Spark Marketing, Inc.; Amur Equipment Finance, Inc.; North Mill Credit Trust; and Dext Capital, LLC.  The proposed second amendment complaint alleges that MMP Capital partnered with BTL to commit fraud in connection with providing financing to plaintiffs to purchase BTL's equipment.  (Proposed Second Am. Compl. ("SAC") ¶ 23, Dkt. No. 33-2).  MMP Capital allegedly later sold that debt to third parties—including Amur Equipment, North Mill, and Dext Capital—without first notifying plaintiffs.  (SAC ¶¶ 26, 156).  The proposed second amended complaint further alleges that Spark Marketing worked with BTL to induce plaintiffs to purchase the equipment.  (SAC ¶ 24).

The proposed second amended complaint asserts nine new causes of action against BTL and the proposed new defendants.  The new counts include claims for fraud against MMP Capital; violation of New York General Business Law § 349 against MMP Capital; violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), against MMP Capital and Spark Marketing; conspiracy against BTL, MMP Capital, and Spark Marketing; negligent misrepresentation against BTL and MMP Capital; violation of the Sherman Antitrust Act, 15 U.S.C. § 1, against BTL; and a request for declaratory relief with respect to Amur Equipment, North Mill, and Dext Capital.  And it contains new factual allegations, most notably concerning ten additional false statements that were allegedly made at the May 5, 2021 meeting.

For several reasons, the motion to amend will be denied to the extent that it seeks to add claims against new parties. To the extent that it seeks to assert new claims against BTL, or additional bases for the fraud claim, the motion will be granted in part and denied in part.

### 1. Claims Against New Parties

#### a. Undue Delay

As to the claims against new parties, the first set of issues concerns undue delay. The motion to amend the complaint to add new parties and new claims comes well more than a year after plaintiffs first sued in state court, and after two rounds of briefing on the motion to dismiss. Plaintiffs have not offered any explanation as to why the proposed amendments were omitted from both the initial complaint and the first amended complaint. *See Nikitine*, 715 F.3d at 390-91. They do not contend that the proposed pleadings are based on newly discovered facts; indeed, the initial complaint itself alleges that MMP financed plaintiffs' equipment purchase "without an interest[-]rate disclosure," suggesting that they have been aware of at least some of the proposed claims since the beginning of the litigation. (Compl. ¶ 9, Dkt. No. 1). This is not, therefore, "a case of new allegations coming to light following discovery, or of previously unearthed evidence surfacing." *Villanueva v. United States*, 662 F.3d 124, 127 (1st Cir. 2011). Rather than providing any justification for the delay, plaintiffs simply rest on the liberal standard of Rule 15 to support their request for a third opportunity to plead their claims in this court. But "[w]ithout any explanation as to why these new theories were not seasonably advanced, the delay in formulating them looms large." *Nikitine*, 715 F.3d at 391.

That failure is particularly problematic where plaintiffs seek to expand the scope of the litigation dramatically by adding five new parties. Furthermore, plaintiffs have not shown that the proposed amendment adding new parties was "sought as soon as an attorney reasonably can be expected to have become aware of the identity of the proposed new part[ies]." *See* D. Mass.

L.R. 15.1(a). At the very least, some degree of explanation is required to show that they complied with the local rule, but plaintiffs have not even attempted to do so.

The "wait and see approach to pleading" has been "explicitly condemned" by the First Circuit, and for good reason: such a tactic "lead[s] to delays, inefficiencies, and wasted work . . . [for] both the courts and party opponents." *Kader*, 887 F.3d at 61 (quoting *Advest*, 512 F.3d at 57). Plaintiffs have had multiple opportunities to assert the proposed claims against the proposed defendants. They "do not get leisurely repeated bites at the apple, forcing [the Court] to decide whether each successive complaint [is] adequate." *Advest*, 512 F.3d at 57.

Under the circumstances, the motion for leave to amend the complaint to add five new parties will be denied on the ground of undue delay (and, as set forth below, violation of Local Rule 15.1(b) and futility).

### b.    **Violation of Local Rule 15.1(b)**

Local Rule 15.1(b) provides as follows:

> A party moving to amend a pleading to add a new party shall serve, in the manner contemplated by Fed. R. Civ. P. 5(b), the motion to amend upon the proposed new party at least 14 days in advance of filing the motion, together with a separate document stating the date on which the motion will be filed. A motion to amend a pleading to add a new party shall be accompanied by a certificate stating that it has been served in advance on the new party as required by this rule.

D. Mass. Local Rule 15.1(b). There is no evidence in the record that plaintiffs have complied with that requirement. That provides a further basis to deny the proposed amendment as to the five new defendants.

### c.    **Futility**

Furthermore, and in any event, the proposed amendments as to the claims against the five new parties fail to state any claim on the merits, and therefore the amendment as to those parties would be futile.

Proposed defendants Amur, North Mill, and Dext are alleged to be the assignees of the debt incurred by plaintiffs. But they are not alleged to have engaged in any tortious conduct, breach of contract, or other wrongdoing of any kind. And because none of the three is alleged to be a citizen of Massachusetts, or to have transacted business in Massachusetts, it is unclear how this court can exercise personal jurisdiction over them.

Proposed defendant MMP is alleged in vague and conclusory terms to have "conspired" or "team[ed] up" with BTL to defraud plaintiffs. (*See, e.g.,* SAC ¶¶ 21, 23). But MMP is not alleged to have made any specific misrepresentations itself to plaintiffs, and there are no specific factual allegations as to any breach of duty or other wrongdoing by the company sufficient to survive a motion to dismiss.[9]

The claims against proposed defendant Spark Marketing are somewhat more detailed, but likewise insufficient. Spark is alleged in general terms to be part of a "conspiracy" with BTL and MMP, and is alleged to have "work[ed] with BTL to support BTL's lies of a booming market, marketing, and endless customers, yet provide little to no customers to those business owners." (SAC ¶¶ 21, 24).

The proposed amendment also includes the following allegations as to Spark:

51. In June 2021, BTL introduced Plaintiffs to a third-party "reliable" marketing agency at the conference, Spark Marketing. Spark Marketing told Plaintiffs it had extensive experience successfully marketing to Emsculpt NEO consumers and schemed with BTL to present Plaintiffs with the illusion of guaranteed profit and customers. Spark Marketing's statements reinforced the enormous opportunity of investing in BTL equipment and further induced Plaintiffs to purchase the additional BTL equipment, specifically, the Emsella and Emtone.

52. On or about September 1, 2021, Breiner entered into contract with Spark Marketing, hiring Spark Marketing to provide customers, as recommended by

---

[9] At most, and as discussed below, it is alleged to have "conspired" with BTL in its fraudulent activity. Even assuming, for present purposes, that the allegations of the complaint state a claim for civil conspiracy, the proposed amendment to add MMP would be denied in any event on the basis of undue delay.

BTL and spent approximately $30,000.00.  Spark Marketing produced no customers for Plaintiffs.

(SAC ¶¶ 51-52).  The only alleged factual assertion by Spark that conceivably would be actionable as fraudulent is the representation that it had "extensive experience successfully marketing" the product to consumers.  There are, however, no specific allegations as to the time or place of that statement or the identity of the speaker.  It is doubtful whether that statement was a statement of fact that could be proved false.  In any event, there is not even any allegation that the statement was false.  And there is no other specific allegation as to any actionable falsehood, nor is there an allegation that Spark breached the contract that it allegedly entered into in September 2021.  Thus, any claim against Spark would fail to survive a motion to dismiss, and the proposed amendment would be futile as to those claims.

Accordingly, and for the foregoing reasons, the motion to amend will be denied to the extent that it seeks to add new parties.

### 2.    New Claims Against BTL

As noted, the proposed second amended complaint seeks to add three new claims against BTL (civil conspiracy, negligent misrepresentation, and violation of the Sherman Act) and various new factual allegations in support of the fraud claim.  It also includes the five remaining state-law claims from the amended complaint that are the subject of the defendant's motion to dismiss.

To the extent that the proposed second amended complaint repeats claims against BTL that were asserted in the first amended complaint, but have been dismissed in this memorandum and order for failure to state a claim (the counts for violation of Mass. Gen. Laws ch. 93A; for violation of the Massachusetts Antitrust Act; for breach of contract; for breach of the implied

covenant of good faith and fair dealing; for fraud, as to certain claims; and for unjust enrichment) the motion to amend will be denied on the ground of futility.

The Court will not deny the proposed amendments as to BTL on the ground of undue delay, albeit with considerable misgivings. It will therefore address whether those amendments should be denied on the ground of futility.

### a. Civil Conspiracy

First, the proposed amendment to add a claim of civil conspiracy against BTL would be futile and will be denied on that basis.

The First Circuit has summarized Massachusetts law of civil conspiracy as follows:

> Massachusetts recognizes two types of civil conspiracy. One, based on section 876 of the Restatement (Second) of Torts, is a form of vicarious liability for the tortious conduct of others. The plaintiff is thus required to prove an underlying tort. The other, drawn from the common law, amounts to a very limited cause of action in Massachusetts for civil conspiracy based on the defendants' allegedly unique ability to exert a peculiar power of coercion when acting in unison. Under the latter theory, the wrong suffered by the plaintiff is in the particular combination of the defendants rather than in the tortious nature of the underlying conduct. Collusive behavior among market competitors is a good example of one of those rare instances in which it is the act of agreeing that constitutes the wrong.

*Snyder v. Collura*, 812 F.3d 46, 52 (1st Cir. 2016) (citation modified).

The proposed second amended complaint alleges that a conspiracy existed between BTL, MMP, and Spark. (SAC ¶¶ 135-41). It does not allege the second type of conspiracy—that is, it does not allege that the three parties had a unique ability to exert a "peculiar power of coercion" over plaintiffs "when acting in unison." *Snyder*, 812 F.3d at 52. Plaintiffs thus apparently seek to allege the first type of conspiracy. Under Massachusetts law, that type of civil conspiracy is a form of vicarious liability; in other words, it is a cause of action against one or more parties who knowingly give substantial assistance or encouragement to another to commit a tortious act (here, fraud). *See Kurker v. Hill*, 44 Mass. App. Ct. 184, 188-89 (1998). But there are no

allegations that BTL knowingly gave substantial assistance or encouragement to MMP or Spark to commit a fraud; indeed, it alleges the reverse, that BTL was the tortfeasor and that MMP and Spark gave it assistance.  Furthermore, and in any event, the proposed claims for civil conspiracy against MMP and Spark are untimely and will not be permitted to proceed.

Accordingly, the motion for leave to file a second amended complaint will be denied as futile to the extent it seeks to add a claim for conspiracy against BTL.

<blockquote>

**b.**    <u>**Negligent Misrepresentation**</u>
</blockquote>

Second, the proposed second amended complaint seeks to add a claim for negligent misrepresentation against BTL.  Under Massachusetts law, to recover for negligent misrepresentation, a plaintiff must prove that "the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information."  *Nota Constr. Corp. v. Keyes Assocs.*, 45 Mass. App. Ct. 15, 19-20 (1998).

Negligent misrepresentation is not a form of "lesser included" tort—that is, it is not a cause of action that is available in every instance in which the evidence supports a claim for intentional misrepresentation.  Instead, the person supplying the allegedly inaccurate information must owe a duty of care to the person receiving it.  That normally requires a fiduciary, confidential, or special relationship between the parties, such as where the defendant has implicitly undertaken to exercise care for the benefit of the plaintiff; the prototypical case involves a claim against an accountant, architect, lawyer, or other professional with a clear duty of care to his or her client.  *See Nota*, 45 Mass. App. at 19-20 (the defendant must "suppl[y] false information for the guidance of others" in "the course of his business").  By contrast, "the

ordinary commercial adversary bargainer ordinarily has no duty to use care in supplying information to those with whom he bargains."  Dan B. Dobbs et al., *The Law of Torts* § 667 (2d ed. 2025).

Here, the proposed second amended complaint alleges no facts to suggest that BTL was in a special relationship with plaintiffs, or otherwise owed a duty of care to them.  Accordingly, the proposed amendment would be futile as to the claim for negligent misrepresentation, and to that extent it will be denied.

### c. <u>Violation of the Sherman Act</u>

The proposed second amended complaint also seeks to add a claim under the Sherman Act.  In substance, the proposed amendment would appear to add a claim for an unreasonable vertical restraint of trade based on a required minimum sales price.  (SAC ¶¶ 162-71).

The circumstances surrounding the addition of this claim are questionable at best. Plaintiffs waited until after the only federal claim, under the Robinson-Patman Act, was dismissed to seek to recast the complaint ahead of a likely third round of motion practice under Rule 12(b)(6).  Plaintiffs even seem to concede that they seek to "add[] a claim for violation of the Sherman Act to allege federal[-]question subject[-]matter jurisdiction" because the Court had dismissed the sole existing federal-law claim.  (Mem. Showing Cause & Mot. for Leave to File ¶ 4, Dkt. No. 33).

Furthermore, it is unclear at this stage whether the MAP program in fact functioned as a vertical price restraint.  In the prototypical vertical price restraint scenario, a manufacturer contracts with a dealer to sell its merchandise at prices no lower than some minimum price set by the manufacturer.  For example, *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, involved a manufacturer that sold its products only to distributors who agreed to resell them at certain set prices.  *See* 220 U.S. 373, 376 (1911), *overruled by Leegin Creative Leather Products, Inc. v.*

*PSKS, Inc.*, 551 U.S. 887 (2007).  Plaintiffs here were not resellers of defendant's equipment: they used defendant's products to provide services to the general public.  To the extent that the MAP program constituted a vertical price restraint, it was a restraint on the price that plaintiffs could charge for services utilizing defendant's products rather than the price at which plaintiffs could resell defendant's products themselves.  And even if the MAP program did constitute a vertical price restraint, it is equally unclear whether it would in fact violate § 1 of the Sherman Act, because such restraints are evaluated according to the rule of reason.  *See Leggin*, 551 U.S. at 882.

Nevertheless, on balance, the claim is not obviously futile at the pleading stage, and the liberal amendment policy of Rule 15 outweighs, if only barely, the countervailing consideration of undue delay and prejudice to defendant.  Accordingly, an adjudication of the merits of the claim will await the development of a more complete factual record, and plaintiffs will be permitted to amend their complaint to add the claim under the Sherman Act.

### d. <u>Additional Fraud Allegations</u>

The proposed second amended complaint also includes new allegations of ten additional false statements that were made by BTL's representatives during the May 5, 2021 meeting. These additional alleged misstatements are the following:

- "The market is $4000 per treatment session, but BTL's equipment gets $4500 per treatment session."  (SAC ¶ 25(n)).

- "Breiner will make 2.5 times the investment on one system before needing to replace the paddles."  (*Id.* ¶ 25(o)).

- "BTL is very strict on pricing and where the devices will be placed to maintain the market at the minimum advertised price."  (*Id.* ¶ 25(p)).

- "$289,000 is the current price for the Emsculpt Neo but they have been told by BTL that it will be going up to $329,000." (*Id.* ¶ 25(q)).

- "Breiner would be the only academic center in the area and would be paid to speak at dinners." (*Id.* ¶ 25(r)).

- "The sales representatives get paid based upon the number of units they sell and not on the price of the equipment is sold for." (*Id.* ¶ 25(s)).

- "BTL is doing $30 million in marketing." (*Id.* ¶ 25(t)).

- "There is no other provide of BTL equipment within 26 miles of Briner." (*Id.* ¶ 25(u)).

- "BTL provides a bus tour that will bring Breiner loads of customers." (*Id.* ¶ 25(v)).

- "The interest rate for the financing of the Emsculpt Neo would be 6.8%." (*Id.* ¶ 25(w)).

At least four of those alleged statements are clearly not actionable in fraud. The allegation at subparagraph 25(o) ("Breiner will make 2.5 times [its] investment" before "needing to replace the paddles") is an optimistic prediction about the future. Again, such predictions cannot form the basis for an actionable fraud claim. *See In re Access Cardiosystems, Inc.*, 404 B.R. at 651, 674. The statement at subparagraph 25(p) expresses an opinion; whether "BTL is very strict on pricing" is not something that is susceptible to being proven literally true or false. The statement at subparagraph 25(q) is classic puffery or a negotiating tactic, in the nature of "Buy now before prices go up!" And the statement at subparagraph 25(r) represents only a prediction about where other centers might be located and the success Breiner would have.

31

Other alleged statements, however, are at least sufficiently plausible to form the basis for a fraud claim.  Assertions such as that "BTL is doing $30 million in marketing" or that "BTL provides a bus tour that will bring Breiner loads of customers" are potentially susceptible to being proved true or false—for example, if BTL as not performing any marketing at all, or did not provide any bus tour.  And although the complaint is silent as to how plaintiffs knew that these statements were false or misleading, the claims are sufficiently pleaded to survive a motion to dismiss.  Furthermore, because defendant was already on notice that plaintiffs were alleging fraud arising out of statements made at the May 5, 2021 meeting, the prejudice inherent in allowing plaintiffs to add these additional statements as a basis for the fraud claim is somewhat minimized.  To that extent, therefore, the motion to amend will be allowed.

### e.    Conclusion

For the foregoing reasons, the motion to amend will be denied as to the claims for civil conspiracy (Count 12 in the proposed second amended complaint) and negligent misrepresentation (Count 13) and granted as to the claim for violation of § 1 of the Sherman Act (Count 16).  The motion will also be granted in part to the extent that plaintiff seeks to add certain additional statements made by defendant's representatives as a basis for its fraud claim.  Specifically, the motion will be granted as to the alleged statements in subparagraphs 25(n), (s), (t), (u), (v), and (w), and denied as to the other new allegations.

## IV.    Conclusion

For the foregoing reasons,

1.    Defendant's motion to dismiss the state-law claims is GRANTED as to Counts 1, 2, 3, 4, 5, and 8 of the first amended complaint.  As to Count 6, the motion is GRANTED as to the allegations in paragraphs 15(b), (d), (f), (g), (i), and (k), and is otherwise DENIED.

2.      Plaintiffs' motion for leave to file a second amended complaint is DENIED to the extent it seeks to add

    (a)    claims against MMP Capital, Inc.; Spark Marketing, Inc.; Amur Equipment Finance, Inc.; North Mill Credit Trust; and Dext Capital, LLC;

    (b)    claims against BTL Industries, Inc., for civil conspiracy and negligent misrepresentation;

    (c)    claims for misrepresentation based on the allegedly false statements set forth in paragraphs 25(o), (p), (q), and (r) of the second amended complaint; and

    (d)    the claims set forth in Counts 1, 3, 4, 5, and 7 of the second amended complaint, and

is otherwise GRANTED.

3.      Plaintiffs shall file a second amended complaint in conformance with this memorandum and order within 14 days.  Defendant shall respond to the second amended complaint within 14 days after that filing.

**So Ordered.**

                          /s/  F. Dennis Saylor IV
                          F. Dennis Saylor IV

Dated:  January 15, 2026           United States District Judge